IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



FILED
JAN 2 4 2011
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:10cr384 |
| ) | |
| LUIS ALBERTO NAPAN, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This drug trafficking prosecution grows out of the mailing of a package from Bolivia to defendant's home in Alexandria, Virginia. The package was inspected upon its arrival in the United States in Miami, Florida, where a United States Customs and Border Protection ("CBP") Officer x-rayed and subsequently opened the package and found cocaine hidden inside. Defendant argues that the opening of the package in Miami was an illegal search that compels the package's exclusion from evidence in his forthcoming trial for unlawful importation of a controlled substance. The government responds that the search was a border search not subject to the requirement of a warrant, probable cause, or reasonable suspicion under the Fourth Amendment or relevant statutes. Alternatively, the government contends that even assuming, *arguendo*, that reasonable cause to suspect that the package contained contraband was required under 19 U.S.C. § 482, the record facts satisfy this standard.

For the reasons that follow, the CBP Officer's search was lawful, and defendant's motion to suppress must be denied.

I.

Defendant Luis Alberto Napan is a citizen of Bolivia and a lawful permanent resident of the United States who has lived in this country for twenty-five years. He is charged in a single-

count indictment with violating 21 U.S.C. § 963 by knowingly and intentionally conspiring to import cocaine into this country from Bolivia. The record reflects that a parcel post package was mailed from Bolivia to defendant's home in Alexandria, Virginia. When the package arrived at the airport in Miami, Florida from overseas on July 7, 2010, it was promptly unloaded and taken to a customs inspection center located in the Miami International Service Center of the Post Office approximately ten miles from the airport. There, the package was x-rayed[1] and subsequently searched by CBP Senior Officer John Bellis, who discovered cocaine secreted inside the hollow picture frames and coasters contained in the package. Defendant seeks suppression of the fruits of the search, arguing that the search was unlawful under the Fourth Amendment and various statutes, as Officer Bellis had neither probable cause nor reasonable suspicion to search the package.

At the suppression hearing, the government, which has the burden of proof in these matters,[2] presented two witnesses: Officer Bellis and United States Postal Inspector Steven Tracy. Inspector Tracy authenticated the outer packaging of the package in question and testified that the postal markings indicated the package was sent from Bolivia and was parcel post, as opposed to letter post.

---

[1] Defendant does not argue that the x-ray scan was an impermissible search, recognizing perhaps that it is well established that an x-ray scan of incoming international mail, while clearly a "search" under the Fourth Amendment, is well within the government's constitutionally recognized border search powers. See *United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002) (noting that "[x]-ray examination of luggage, bags, and other containers at a border" is a search but is "routine and requires neither warrant nor individualized suspicion"); *United States v. Johnson*, 991 F.2d 1287, 1293 (7th Cir. 1993) (same); *United States v. Udofot*, 711 F.2d 831, 840 (8th Cir. 1983) (same).

[2] See *United States v. Davis*, 332 F.3d 1163, 1168 (9th Cir. 2003) (government has the burden to demonstrate the lawfulness of a challenged search); *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (same); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption [from the Fourth Amendment's restrictions on searches] to show the need for it.").

Officer Bellis's testimony, which was credible in all respects, focused on the package's arrival at the Miami International Service Center and his inspection and search of the package. He began his testimony by describing his background, experience, and training, as well as the Post Office procedures for inspecting packages mailed to the United States from other countries. He testified that he has at least sixteen years of service with CBP inspecting inbound international mail for various forms of contraband using x-ray equipment. He explained the procedures he follows for inspecting packages and the steps he took in this particular case to identify this package as suspicious before opening and searching it.

More specifically, Officer Bellis explained that when international mail arrives in Miami, it is unloaded and picked up by postal mail handlers or, in some instances, private contractors hired by the Postal Service, who transport the mail from the airport to the Miami International Service Center of the Post Office, located approximately ten miles from the airport. This International Service Center houses the Foreign Mail Center, which includes a customs inspection area where Officer Bellis operates one of several x-ray machines used to scan incoming foreign mail for contraband. The inspection of foreign mail at this location is the first such inspection—and indeed the first opportunity for such an inspection—of incoming foreign mail once the mail crosses the United States border. Officer Bellis noted that the FMC in Miami is considered a functional equivalent of the border ("FEB"), meaning that packages are scanned at the FMC as part of a border inspection.

Officer Bellis further testified that based on his training and experience scanning more than 10,000 packages throughout his career, he made several noteworthy observations when inspecting the package in issue. First, he noted that the package originated from Bolivia, a known source for the illegal importation of narcotics. Second, based on the x-ray scan, he

identified the objects inside as being picture frames and a set of disc-like objects that appeared to be a set of coasters, all of which was consistent with markings on the outer packaging identifying the contents as "[a]rtesania," Spanish for "crafts." Third, he observed on the x-ray scan that the objects inside were unusually dense as compared to other objects of this variety that Officer Bellis had scanned during his career. This unusual density made Officer Bellis suspicious that the objects concealed narcotics, as in his experience, tightly-packed powder typically appears dense when viewed using x-rays. Taking all of this information and his experience into account, Officer Bellis decided the package was sufficiently suspicious to warrant further examination. To this end, he removed the outer packaging and opened the box, which he found to contain a set of coasters and picture frames. The picture frames were made of leather in a style known by Officer Bellis to come from certain South American countries, including Bolivia, except that these picture frames appeared to be unusually thick and hard. Accordingly, he pierced the leather covering slightly with a knife and observed that some white powder emitted. He then cut a larger hole and collected a sample of the powder for testing. A field test confirmed Officer Bellis's suspicion that the powder was cocaine. The coasters were similarly found to contain hidden amounts of cocaine. In all, nearly fourteen ounces of cocaine were collected from the package's contents.

The package was subsequently shipped to Alexandria, Virginia, where agents from the United States Postal Service and Immigration and Customs Enforcement Homeland Security Investigations conducted a controlled delivery at defendant's home. The package was delivered, and when defendant, who was in the home, opened the package,[3] agents entered his home pursuant to a search warrant and arrested him.

---

[3] Prior to delivery, agents inserted a device into the package to notify them when the package

4

Defendant contends that Officer Bellis's search at the FMC in Miami was unlawful and that the results of the search should be suppressed. The government responds that the search was a border search, and based on the constitutional and statutory principles that apply to border searches, neither probable cause nor reasonable suspicion is required to search the package in this case. In the alternative, the government contends that, at most, it need only demonstrate a reasonable suspicion that the package contained contraband to sustain the legality of the search.

## II.

Analysis of the search's legality appropriately begins with a brief recitation of the well settled principles concerning border searches. First, it is beyond question that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). And, given "the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," it is now well established that the Fourth Amendment's reasonableness requirement is *per se* satisfied in border searches. *Id.* (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *United States v. Bilir*, 592 F.2d 735, 740 n.6 (4th Cir. 1979). Thus, border searches "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152. This power stems from the "inherent authority" of the United States, as sovereign, "to protect . . . its territorial integrity." *Id.* Even at the time the Fourth Amendment was drafted, the "plenary customs power" was understood to be distinct from "the more limited power to enter and search any particular dwelling-house, store, building, or other place where a warrant . . . was required." *Ramsey*, 431 U.S. at 616 (quotations omitted). As the Fourth Circuit has explained, the "realization that important national security interests are at stake has resulted in courts giving the broadest interpretation compatible with our

---

was opened.

constitutional principles in construing the statutory powers of customs officials." *United States v. Ickes*, 393 F.3d 501, 505 (4th Cir. 2005). Accordingly, no warrant or probable cause requirement applies to border searches of persons or property, including, but not limited to, cars, luggage, containers, and parcels.[4] *Ramsey*, 431 U.S. at 616-19.

Courts have long recognized that the principles applicable to border searches apply not only at the precise border crossing or territorial boundary, but also where, as here, packages are taken from the airport where they arrive to a nearby facility for customs inspection. Thus, in *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), the Supreme Court addressed the geographic limitations on border searches and sensibly recognized that practical considerations limit the government's ability to conduct searches at the precise point where people and effects cross into the United States. *Id.* at 276. In that case, United States Border Patrol agents stopped a vehicle approximately twenty five miles north of the United States-Mexico border on an east-west California highway that roughly parallels, but does not intersect, the border. The officers conducted a warrantless, suspicionless search of the vehicle, which the government later argued, *inter alia*, was justified by the expansive principles applicable to border searches. *Id.* at 272-73. Importantly, the Supreme Court recognized that border searches "may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." *Id.* As an example, the Supreme Court noted that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the

---

[4] Although not relevant here, it is worth noting that there is a remaining question—unresolved in the Supreme Court and the Fourth Circuit—concerning whether letter mail is an exception to the general rule that border searches are *per se* constitutionally reasonable. Although the Supreme Court and the Fourth Circuit have acknowledged the question, both have thus far declined to decide it. *See Ramsey*, 431 U.S. at 611 (declining to reach this question because the search in issue was justified by reasonable cause to suspect the unlawful importation of contraband); *United States v. Safari*, 849 F.2d 891 (4th Cir. 1988) (same).

functional equivalent of a border search." *Id.* Although the Supreme Court applied these principles to find that the search in *Almeida-Sanchez* was not a border search, the principles announced in that opinion nonetheless compel the opposite result here, just as those principles have compelled the opposite result in every case challenging the search of incoming international mail at the airport of arrival. *See, e.g., United States v. Smith,* 29 F.3d 270, 273 (7th Cir. 1994) (recognizing the search of incoming international mail at or near the arrival airport to be a search at the functional equivalent of the border); *United States v. Gaviria,* 805 F.2d 1108, 1112 (2nd Cir. 1986) (same); *United States v. Klein,* 592 F.2d 909, 911 n.1 (5th Cir. 1979) (same).

In *Almeida-Sanchez*, the Supreme Court based its rejection of the government's border-search argument on the fact that the vehicle was stopped more than twenty miles north of the border on a road that did not intersect the border. 413 U.S. at 273. In essence, the Supreme Court found that the search conducted by a "roving patrol" twenty miles from the border was "wholly different" from border searches, such that principles underlying border searches did not apply. That situation in no way resembles the instant case. Instead, this case closely resembles an example in *Almeida-Sanchez* of a functional equivalent of a border search, namely "a search of the . . . cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City." *Id.* Like the search of the cargo in *Almeida-Sanchez*, the search of the package in this case occurred not at the precise territorial boundary of the United States, but at a location some distance away where it was reasonably practicable to conduct such a search.[5] And like the search of the cargo, the search of the package here was conducted prior to the release or delivery of the package to the designated addressee, and both searches were performed as part of the

---

[5] *See also United States v. Bilir,* 592 F.2d 735, 740 (4th Cir. 1979) (holding that a search less four miles from the border was a border search where the vehicle was searched seven hours after crossing the United States border from Mexico but continuously surveilled during those seven hours).

customs process for the purpose of protecting this country's territorial integrity and preventing the entry into this country of unlawful or contraband materials. *See Ramsey*, 431 U.S. 606. There can be no serious question, therefore, that the opening of the package in this case was the functional equivalent of a border search. Because the challenged search was a border search, it was *per se* reasonable under the Fourth Amendment and the government was not required to obtain a warrant or adduce probable cause.

### III.

Yet, this conclusion does not end the analysis as defendant argues further that, quite apart from the Fourth Amendment, 19 U.S.C. § 482 authorizes a border search of mail only where there is "reasonable cause to suspect" the unlawful importation of contraband and that Officer Bellis's search does not meet this standard. The government responds that the record facts satisfy the reasonable suspicion standard imposed by § 482. In the alternative, the government points out that two other statutes, 19 U.S.C. §§ 1581 and 1582, and accompanying regulations, authorize the search in question without the need to establish any level of suspicion or probable cause. Yet, the government does not explain how three statutes governing the same activity with different standards can be harmonized in this case, and no such explanation is readily apparent.[6]

---

[6] Section 1581 authorizes "[a]ny officer of the customs [to] go on board of any vessel or vehicle . . . [and to] search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board." § 1581(a). The Fourth Circuit has recognized this statute as providing "sweeping" authority for "expansive border searches." *Ickes*, 393 F.3d at 503. Section 1582 authorizes the Secretary of the Treasury to "prescribe regulations for the search of persons and baggage," which the Secretary implemented through, inter alia, 19 C.F.R. §§ 145.5 and 162.6. Section 145.2 authorizes suspicionless "examination" of "[a]ll mail arriving from outside the Customs territory of the United States." *But see* 19 C.F.R. § 145.3 (excepting from § 145.5 "sealed letter class mail which appears to contain only correspondence," which requires a search warrant to inspect). The regulation found in § 162.6 is even broader, authorizing customs agents "to cause inspection, examination, and search . . . of persons, baggage, or merchandise" that arrive "in the Customs territory of the United States from places outside thereof." *Id.* Courts have consistently found suspicionless searches of incoming foreign mail permissible under §

8

In any event, the more restrictive standard imposed by § 482 is satisfied in this case, making it unnecessary to resolve the apparent conflict between § 482 on the one hand and §§ 1581 and 1582 and the related regulations on the other. Accordingly, the analysis here focuses solely on the more restrictive § 482 standard.

Section 482 authorizes the "search [of] any trunk or envelope, wherever found, in which [the border agent] may have a reasonable cause to suspect there is merchandise which was imported contrary to law." *Id.* In *Ramsey*, reasonable cause existed where the postal inspector "knew that [the letters] were from Thailand, were bulky, were many times the weight of a normal airmail letter, and 'felt like there was something in there.'" 431 U.S. at 612. The Fourth Circuit similarly found an appropriate basis under § 482 to justify the search of a package from Pakistan "[a]fter squeezing the package and noticing a 'powdery' or soft texture to the contents," after which the customs agent "pierced the parcel with a thin knife" to reveal white dust that field-tested positive for heroine. *United States v. Safari*, 849 F.2d 891 (4th Cir. 1988). Defendant argues that this case is distinguishable from *Safari* because prior to opening the package, the agent in *Safari* took the additional steps (not undertaken in this case) of (i) squeezing the package and (ii) piercing the package with a small knife. Defendant's argument is without merit. First, the Fourth Circuit did not hold that the steps taken by the agent in *Safari* were required for a § 482 search; rather, the court merely held that the steps taken by the customs agent justified that particular search, indicating only that the analysis must proceed on a case-by-case basis. Second, the steps taken in *Safari* actually went beyond the steps taken in *Ramsey*, at least insofar as the

---

1582 and the accompanying regulations. *See, e.g., United States v. Emery*, 541 F.2d 887, 889 (1st Cir. 1976); *United States v. Glasser*, 750 F.2d 1197 (3d Cir. 1984); *United States v. Pringle*, 576 F.2d 1114, 1116 (5th Cir. 1978); *United States v. Odland*, 502 F.2d 148, 150 (7th Cir. 1974), *cert. denied*, 419 U.S. 1088 (1974). All three statutes—19 U.S.C. §§ 482, 1581, and 1582—and the regulations arguably apply to the search of incoming foreign mail, yet they do not provide a consistent standard for determining when such a search is permitted.

postal inspector in *Ramsey* did not squeeze the package or pierce the package with a small knife prior to opening it. Obviously, the Fourth Circuit did not and could not require a stricter standard under federal law than that which the Supreme Court imposed. Third, in this case, Officer Bellis relied in part on an x-ray of the package, which was not available to the officers in either *Ramsey* or *Safari*. This x-ray revealed items of greater density than would be expected of similarly shaped items, and given the officer's extensive experience reviewing x-rays of incoming foreign packages, it is appropriate to afford considerable weight to the officer's interpretation of this x-ray scan.

In all, the totality of the circumstances here supports Officer Bellis's conclusion that reasonable cause existed to suspect that the package contained unlawfully imported contraband. *Cf. Ornelas v. United States*, 517 U.S. 690, 701 (1996) (recognizing that district court's finding of reasonable suspicion or probable cause based on the totality of the circumstances "is ordinarily accorded deference"). As such, the search of the package in this case was warranted under § 482 and accordingly, under *Ramsey*, the search was lawful and did not offend defendant's constitutional rights. *See Ramsey*, 431 U.S. at 623-24.

IV.

Because the package's search constituted a border search, and because the search was within the government's constitutional and statutory authority, defendant's motion to suppress must be denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
January 24, 2011

T. S. Ellis, III
United States District Judge